UNITED STATES of America, Plaintiff,

v.

Artem Bautista DAVID, Defendant.

No. CR–S–90–121–PMP (LRL).

United States District Court,
D. Nevada.

Jan. 28, 1991.

---

Bradford R. Jerbic, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff.

Seymour Amster, Woodland Hills, Cal., for defendant.

ORDER

PRO, District Judge.

On July 13, 1990, Defendant Artem Bautista David filed a Motion for Return of Property and Suppression of any Evidence Received from Said Property (# 15). On January 8, 1990, the Honorable Lawrence R. Leavitt entered a Report and Recommendation (# 63) recommending granting in part Defendant's above-referenced Motion. No Objections were filed in accordance with Local Rule 510–2 of the Rules of Practice of the United States District Court for the District of Nevada. On January 28, 1991, the Clerk of Court referred Defendant's Motion to the undersigned for consideration.

The Court has conducted a *de novo* review of the record in this case in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule 510–2 and determines that the Report and Recommendation entered January 8, 1991, should be affirmed.

IT IS THEREFORE ORDERED that the Report and Recommendation of Magistrate Judge Leavitt entered January 8, 1991 (# 63) is affirmed and Defendant's Motion for Return of Property and Suppression of any Evidence Received from Said Property (# 15) is granted to the extent that any information and any evidence derived from that information which the Government obtained from Defendant David's computer memo book from that point forward at which Agent Peterson first accessed the book in David's presence is hereby suppressed.

REPORT AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE

(Motion for Return of Property and Suppression of Evidence—# 15)

Filed Jan. 8, 1991.

LAWRENCE R. LEAVITT, United States Magistrate Judge.

On June 21, 1990, the federal grand jury returned a one-count Indictment charging the defendant, Artem Bautista David, with conspiracy to import more than 20 kilos of heroin into the United States.

On July 13, 1990, David filed a Motion for Return of Property and Suppression of Evidence Received from Said Property (# 15). He seeks an order (1) requiring the U.S. Customs Service to return a hand-held computer memo book (hereafter "book") which it seized from him on May 7, 1990, and (2) suppressing as evidence all information which Customs obtained from the book and all evidence derived from that information. The defendant contends that the book was seized without benefit of a search warrant, and that the seizure of the book, and the search for and seizure of its contents, cannot be justified under any exception to the warrant requirement.

Acknowledging that no search warrant was issued herein, the government nevertheless justifies the searches and seizures on the alternate grounds of plain view, consent, exigent circumstances and abandonment.

## I. *The Evidence*

An evidentiary hearing was conducted before the undersigned Magistrate Judge on September 12, 1990. The testimony established that in late April, 1990, David flew from Hong Kong to Las Vegas and was taken into custody by Customs agents on a charge of conspiracy to smuggle heroin into the United States. Government counsel engaged in discussions with David's then counsel, John R. Lusk, with a view toward enlisting David's cooperation in exchange for a favorable plea bargain. An agreement was reached whereby David, who would remain in custody under a detention order, would meet periodically with the agents in their office and make full disclosure of his knowledge of drug trafficking activities in an "off the record" proffer. It was expressly agreed that nothing David said would be used against him in the event the negotiations fell through and he were fully prosecuted. It was also expressly agreed that *derivative* use of David's statements was not covered by the immunity agreement. That is, in the event the discussions did not result in a plea agreement, and full prosecution of David were initiated, the government would be able to use against David all evidence obtained from leads derived from David's statements. The agreement was silent, however, on the subject of David providing the government with documents, records, receipts, and all like material which David had in his custody, or to which he had access. The agreement also provided that at the agents' direction, David would place consensually monitored telephone calls to his criminal associates. The telephone numbers of those associates were kept in David's computer memo book, access to which required the use of a password—"fortune"—which was known only to David.

During one such meeting in early May, 1990, which Lusk attended, David retrieved and disclosed certain information contained in the book. At the time, the agents were sitting across the table from him and were unable to see the password which David used or the information displayed on the book's screen. David did not volunteer the password to the agents, or offer to show them the book.

Jail regulations prohibited David from taking the book back to the jail at night. For the sake of convenience, Lusk permitted the agents to maintain custody of the book at the end of each session. Lusk did not, however, give them permission to access the book. Neither did David. Nor, as noted above, did the assistance agreement itself expressly permit the agents to gain access to the book or, for that matter, to any other property in David's possession.

At the next meeting on May 7, 1990, David met with Customs Special Agent Eric Peterson and DEA Special Agent Don Ware. Lusk did not attend this meeting. According to David's testimony, when he initially accessed the book at this meeting, Agent Peterson got up and stood directly behind him. David was aware that Peterson was looking over his shoulder, but did not feel that he could demand that Peterson move away. David did, however, try to position the book so as to minimize Peterson's view of it.

According to David's testimony, after he made two telephone calls for the agents,

Peterson grabbed the book and accused David of deleting certain information. David demanded the book back, but Peterson refused. At the evidentiary hearing, David denied having deleted information from the book. Agent Peterson's version of what occurred at the meeting is a little different. Peterson testified that on May 7, 1990, he first requested the access code from David, but David was unresponsive. Peterson admitted that he then stood behind David and observed David use the password "fortune" to access the book. A little later, while Agent Ware was criticizing David for not cooperating fully during a consensually monitored phone call, Peterson, without requesting David's permission, used the password "fortune" and accessed the book himself. He then reviewed several of its entries. David saw Peterson doing this, but said nothing. Peterson came across an entry which read "1 = 12,000; 2 = 23,000," which, based on his experience as a Customs agent, he knew to be a heroin price list per kilo in Thailand. He then turned off the computer and returned it to David. Peterson testified that he did not seek David's consent to access the book because he believed that the assistance agreement itself conferred upon him the right of access without David's express permission. He admitted, however, that he did not solicit either Lusk's or the prosecutor's opinion on whether the agreement gave him such a right.

According to Peterson's testimony, after he handed the book back to David, David turned it back on and immediately deleted the heroin price list. As David was getting ready to delete a firearms price list, Peterson grabbed the book out of David's hands. Although at the hearing David denied having deleted anything from the book, the Court finds Agent Peterson's testimony more credible on this point, and therefore concludes that it was David's act of deleting entries in the book that caused Peterson to seize it.

At that point the cooperation agreement between David and the government collapsed. Peterson has since maintained custody and control of the book, and has reviewed all the information contained in it.

Peterson admitted that following his seizure of the book he had ample time to obtain a search warrant for the purpose of re-accessing the book if he had chosen to obtain one. However, he did not do so, nor did he seek the advice of the prosecutor as to whether a search warrant was required under the circumstances.

## II. *Discussion*

 The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The Supreme Court has defined a *search* as an infringement of "an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). Hence, a law enforcement officer who looks at something has not engaged in a "search" within the meaning of the Fourth Amendment unless someone else has a right to expect that the thing which is seen will remain private.

 A *seizure* of tangible property is defined as "some meaningful interference with an individual's possessory interest in that property." *Ibid.* Therefore, unless an individual's control over or access to property in which he or she has a possessory interest is interrupted or otherwise interfered with by law enforcement officers in some meaningful way, there is no "seizure" within the meaning of the Fourth Amendment.

The Courts have also recognized that information, i.e., *intangible* items, may be seized within the meaning of the Fourth Amendment; *see Berger v. New York,* 388 U.S. 41, 59–60, 87 S.Ct. 1873, 1884, 18 L.Ed.2d 1040 (1967) (tape recorded conversations); *United States v. Marbury,* 732 F.2d 390, 399–400 (5th Cir.1984) (copying down identification numbers from items of equipment); and *United States v. Meriwether,* 917 F.2d 955, 958 (6th Cir.1990) (telephone numbers from an electronic display-type pager).

In evaluating the factual scenario described above, we begin by identifying those events which may have Fourth Amendment implications. The *first* such event occurred when Agent Peterson deliberately looked over David's shoulder to see the password to the book. David himself voluntarily accessed the book at a time when the agents were in close proximity to him. Agent Peterson was not required to stay seated across the table from David. Nor did David have a reasonable expectation that Peterson would not walk behind him, or remain outside of some imaginary zone of privacy within the enclosed room. It was Peterson's office, and he could move about in it wherever he pleased. The Court therefore finds that under the circumstances David had no reasonable expectation of privacy in the display that appeared on the screen, and accordingly concludes that Peterson's act of looking over David's shoulder to see the password did not constitute a search within the meaning of the Fourth Amendment. Hence, the Court need not reach the question whether the plain view doctrine would save the legality of the purported search.

The *second* such event occurred when Peterson picked up the book, turned it on and entered the password. Peterson's use of the book lasted only a few moments, and David was not prevented thereby from using the book himself. Peterson's act of picking up the book was therefore not a seizure, because it did not interfere with David's possessory interest in the book in any meaningful way.

Peterson's act of accessing the book did constitute a search, however, if, under the circumstances, David had a reasonable expectation that when he turned the book off, its contents would remain private. For the purposes of this discussion, the book, in the Court's view, is indistinguishable from any other closed container, and is entitled to the same Fourth Amendment protection. *Robbins v. California*, 453 U.S. 420, 427, 101 S.Ct. 2841, 2846, 69 L.Ed.2d 744 (1981); *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The Court does not question Agent Peterson's testimony that based on David's cooperation agreement with the government, Peterson had a good faith belief that he had the right to access the book. Peterson testified that in his mind the cooperation agreement implied that David would withhold nothing from the agents, including the contents of his memo book. But David's attempt to prevent Peterson from seeing the password, and his deletion of the heroin price list and attempted deletion of the firearms price list, clearly reflect that at the very least David did not *want* to share all of the contents of the book with the agents.

The Fourth Amendment protects the "security of one's privacy against arbitrary intrusion by the police...." *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782. But the Fourth Amendment only protects legitimate expectations of privacy. *United States v. Jacobsen, supra*. It does not protect subjective expectations of privacy that are unreasonable or otherwise "illegitimate." *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The question, therefore, is whether, by providing information to the government upon a hope of obtaining a favorable plea bargain, David surrendered his legitimate expectation of privacy in the contents of his book.[1] Put another way, by entering into the cooperation agreement with the government did David consent, whether expressly or impliedly, to the search of his book? In approaching this question the Court is mindful that the

1. One of the positions taken by the government in defense of the warrantless searches is that the defendant "abandoned" the book when he left it in the custody of the agents over night. The record does not support the government's position. Property is abandoned when the owner no longer intends to retain an expectation of privacy therein. *United States v. Diggs*, 649 F.2d 731 (9th Cir.1981). The owner's intent is to be measured by objective standards. *United States v. Oswald*, 783 F.2d 663 (6th Cir.1986). David did not disclaim ownership of the book, or attempt to disassociate himself from it. Nor, clearly, did he tell the agents they could keep it. He merely left it in the agents' custody overnight for safekeeping, with the understanding it would be returned to him the next day.

burden is always on the government to prove that "consent was given freely and voluntarily, and was not mere acquiescence to a claim of lawful authority." *United States v. Massell*, 823 F.2d 1503, 1507 (11th Cir.1987); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

Clearly David did not *expressly* consent to the search of the contents of the book. The cooperation agreement itself was silent on the subject of searches. Nor did it provide that David would give the agents access to his private papers or other things. Moreover, at no time did David affirmatively provide the password to Agent Peterson.

The critical question is whether David otherwise *impliedly* consented to the search of the contents of his book. To the extent that the book is analogous to a closed container, the agents' knowledge of the password is analogous to their possession of a key to the container. But unless the owner of the container voluntarily surrenders the key to the agents, their act of finding the key does not, in itself, give them the right to use it. Likewise, merely because Agent Peterson was able to see the password which could be used to "unlock" the book does not, without more, give him the right to use it. Moreover, David's failure to protest Peterson's use of the password is not equivalent to giving his approval of it. "[C]onsent cannot be presumed from the absence of proof that a person resisted police authority or proof that the person merely acquiesced." *Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir.1985).

Due to the unique circumstances of this case, a standard consent analysis provides little assistance in resolving this issue. Such an analysis would normally require the Court to make a factual determination of whether David's consent was, for example, tainted by an unlawful arrest, or was obtained through subterfuge, or by means of threats or force. Such issues are not presented here. Rather, this is a case in which the Court must decide whether David's consent to the search of his computer memo book was at that moment implicit in the *nature of his relationship with the government.* Unfortunately, the undersigned has not been provided, and has been unable to find, any case authority which addresses this narrow issue.

Pursuant to the agreement of counsel, David was to provide truthful information to the government and make consensually monitored phone calls. The government was obligated to make a good faith evaluation of David's assistance and to offer a plea bargain whose benefit to David was to be measured by the value of his assistance. The government was not obligated to offer David anything if it believed that David was not being fully cooperative. If David were not to cooperate fully, the agreement would be void, and he would be exposed to full prosecution. His only protection prior to obtaining a plea agreement from the government was a narrowly defined offer of use immunity whose scope expressly excluded evidence derived from the information he provided.

Importantly, the agreement was silent as to the government's authority to search, or conversely David's obligation to produce, his private papers and things. It was also silent as to whether any such things, if seized, could be used against him in the event that the negotiations broke down. Hence, David was not put on notice that in order to merit the government's consideration he was under an obligation to submit his private papers and things to government scrutiny. Nor was he provided any protection from their use against him in the event they were searched or seized. As to such "things," David was proceeding at his peril. This placed him in an untenable position. For if he were simply to have read the entries in his book aloud to the agents, the use immunity agreement would have prevented the government from using that information against him. Yet if the book itself were seized and accessed without David's express consent, the government would be able to use the very same information. Under this scenario, the government would be allowed to do indirectly what it would not be allowed to do directly. It would therefore be fundamentally unfair to find that David's consent was implicit in the nature of the relationship. Where, as

here, a person enters into an agreement with the government whereby, upon an offer of use immunity, he undertakes to provide incriminating information in the hope of receiving a favorable plea bargain, and the agreement does not expressly authorize the government to search the person's private papers and things, this Court believes that the government may not conduct a warrantless search of such papers and things without first obtaining the person's express consent, freely and voluntarily given.

This would be a different case if the cooperation agreement had expressly required David to disclose his private papers and things. David would then have been on notice that his refusal to produce such things would have constituted a breach of the agreement. In that case, Agent Peterson would have been entitled to do exactly as he did here, at least until David expressly revoked his consent. Upon the revocation of David's consent, the government would have been free to prosecute him fully, but they would no longer have had warrantless access to his book.

For all of the foregoing reasons, the Court concludes that David's consent to the search of his book was not implicit in the cooperation agreement with the government. Accordingly, the government should not be allowed to use as evidence the information which Agent Peterson obtained from the book when he accessed it without David's express consent.

■ The *third* event which had Fourth Amendment implications occurred when Agent Peterson grabbed the book out of David's hands after David deleted the heroin price list. This was unquestionably a seizure, because David has thereafter been deprived of the book.

■ The government argues that exigent circumstances justified the seizure. The Court agrees. When destruction of evidence is imminent, a warrantless seizure of that evidence is justified if there is probable cause to believe that the item seized constitutes evidence of criminal activity.

*United States v. O'Connor*, 658 F.2d 688, 692, n. 6 (9th Cir.1981); *United States v. Gonzalez–Rodriguez*, 513 F.2d 928, 930 (9th Cir.1975). Here, Agent Peterson saw David destroying evidence. David's use of the book in retrieving telephone numbers of criminal associates provided ample probable cause that the book contained information relative to criminal activity. Peterson therefore reasonably believed that prompt action was necessary to prevent further destruction of relevant evidence. *United States v. McConnery*, 728 F.2d 1195, 1199 (9th Cir.1984) (en banc).

■ The *fourth* and final event carrying Fourth Amendment implications was Peterson's act of reaccessing the book after its exigent seizure. Since that time Peterson has reviewed all of the contents of the book at his leisure. Clearly this qualifies as a search for Fourth Amendment purposes. *Robbins v. California, supra.*

Although Peterson had the authority to seize and hold the book due to the exigency at hand, his authority to examine its contents is a different matter. *Walter v. United States*, 447 U.S. 649, 654, 100 S.Ct. 2395, 2400, 65 L.Ed.2d 410 (1980). The seizure of the book affected only David's possessory interests. It did not affect the privacy interests vested in the contents of the book. *United States v. Chadwick*, 433 U.S. 1, 13–14, n. 8, 97 S.Ct. 2476, 2485, n. 8, 53 L.Ed.2d 538 (1977).

■ The difference between possessory interests and privacy interests may justify a warrantless seizure of a container for the time necessary to secure a warrant, where a warrantless search of the contents would not be permissible. *Arkansas v. Sanders*, 442 U.S. 753, 761–62, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1970). Peterson had ample probable cause to believe that the book contained information relating to criminal activity. Once he took the book from David the exigency which justified the seizure came to an end.[2] Nevertheless, without seeking a warrant, Peterson conducted a complete search of the book's contents. The seizure of the book

---

**2.** The government argues, lamely, that the exigency continued even after the seizure, because

Agent Peterson did not know how much longer the book's batteries would live. It was therefore

did not justify the invasion of privacy involved in the subsequent search. *United States v. O'Connor*, 658 F.2d 688, 692, n. 6 (9th Cir.1981). Agent Peterson had ample time to obtain a search warrant, but failed to do so. His good faith belief that a warrant was unnecessary cannot save the illegality of the search. Therefore, the information which the government obtained from the book after the seizure, and any evidence derived from that information, must be suppressed at trial.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the United States Magistrate Judge for the District of Nevada that the Motion for Return of Property and Suppression of Evidence Received from Said Property (# 15) should be granted to the following extent: the Court should suppress as evidence all information, and any evidence derived from that information, which the government obtained from David's computer memo book from that point forward at which Agent Peterson first accessed the book in David's presence.

imperative, according to the government, that Peterson access the book before the batteries died and the information was erased. At the evidentiary hearing, however, no evidence was offered to substantiate this concern. In fact, Peterson testified that he successfully accessed the book at a later time without changing the batteries. The government bears a heavy burden of establishing exigent circumstances. *United States v. Spetz*, 721 F.2d 1457, 1465–66 (9th Cir.1983). Speculation is insufficient to carry that burden. *United States v. Hoffman*, 607 F.2d 280, 284 (9th Cir.1979). The government has not met its burden here.