UNITED STATES of America,

v.

William Douglas ROBERTS,
Defendant.

No. H–99–471.

United States District Court,
S.D. Texas,
Houston Division.

Feb. 24, 2000.

Daniel Rodriguez, U.S. Atty's Office, Houston, TX, for U.S.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

Defendant, William Douglas Roberts, is charged with two counts of possession of

child pornography, in violation of 18 U.S.C. §§ 2252 and 2256. Pending before this court is defendant's motion to suppress evidence seized and statements made during an August 25, 1998 search of his person and personal effects. (Docket Entry No. 15). Based on the motion, the evidence, the briefs and arguments of counsel, and the applicable law, this court DENIES the motion to suppress. The reasons for this decision are stated below.

## I. BACKGROUND

On July 7, 1998, Customs Senior Special Agent Steve Coffman "received information from the [United States Customs Service] Resident Agent in Charge, Lake Charles, that a man by the name of William Roberts would be traveling, leaving the country from Houston [Intercontinental Airport that day] . . . on a non-stop flight to Paris." (Tr. 67).[1] The Resident Agent in Charge, Lake Charles ("RAC—Lake Charles") told Agent Coffman that Roberts usually carried his computer and diskettes containing child pornography with him when he traveled, and typically packed the diskettes inside his shaving kit. (Tr. 88, 97). Agent Coffman told Customs Special Agent Hernan Rios the information about Roberts. (Tr. 67). Agents Coffman and Rios went to the Houston Intercontinental Airport ("IAH"), but a computer check of the passenger list showed that Roberts was not on a flight from Louisiana to Houston, as expected. (Tr. 68). The agents stayed at IAH to make sure that Roberts did not board a flight from Houston to Paris; he did not. (Id.). Agent Rios told the RAC—Lake Charles that Roberts had not traveled from Houston to Paris as scheduled. (Id.).

On August 24, 1998, Agent Rios received information from Agent Gene Steech with the RAC—Lake Charles that on the following day, Roberts would be traveling from Louisiana to Houston and then continuing from Houston to a point outside the country. (Tr. 69). The RAC—Lake Charles also provided a photograph of Roberts. (Tr. 73). On August 25, 1998, Lawni Shivers, an officer with the Nachitoches Parish Sheriff's Office in Louisiana, told Agent Rios that Roberts "was suspected of traveling with child pornography, would be in possession of child pornography." Shivers told Agent Rios that the "child pornography would be contained in diskettes, and the diskettes would be in a shaving kit bag." (Tr. 70–72).[2] After receiving this information, Agent Rios and Special Agent Harry Stewart went to IAH to meet with Agent Coffman.

Agent Rios told Agent Coffman that Roberts "was going to be leaving the country and they suspected that he had child pornography." (Tr. 30). The agents checked their computer database, verifying that Roberts was scheduled to depart that day on Air France Flight 33, a nonstop flight from IAH to Paris, France. (Tr. 72). Agent Rios showed Agent Coffman the photograph of Roberts and told him that Roberts would be arriving in Houston on a flight from Louisiana at 12:18 p.m. (Tr. 31). Agent Coffman went to watch the passengers disembarking that flight. Using the photograph provided by Agent Rios, Agent Coffman identified Roberts and noted the clothing he was wearing. (Tr. 31).

At about 2:30 p.m. on August 25, 1998, Agent Coffman went to the Customs area to organize an outbound inspection for Air France Flight 33. Agent Coffman told the inspectors on the outbound enforcement inspection team that "an individual would be passing through Houston on his way outbound on Air France Flight 33 to Paris, France" who "would be in possession of a shaving kit containing zip disks which had

---

1. "Tr. ____" refers to the transcript of the November 1, 1999 suppression hearing, found at Docket Entry No. 23. "G.Ex. ____" refers to the government's exhibits at that hearing.

2. Agent Rios testified that he did not know the original source of the information he received from RAC—LC, Louisiana law enforcement officials, or Agent Coffman, and did not know whether the information was reliable. (Tr. 91–92).

child pornography on them." (Tr. 7–8, 10). Agent Coffman gave the inspectors a description of the clothing Roberts was wearing. (Tr. 32).

At about 3:20 p.m., the agents planned and set up an outbound enforcement inspection area in the jetway to Air France Flight 33. Agent Coffman identified Roberts when he came through the jetway and referred him to the search table. (Tr. 9).[3] Agent Coffman signaled the agents conducting the search that this was the individual they were awaiting. (Tr. 10). When Roberts arrived at the search table, Customs Inspector Keith Hanson asked him if he possessed more than $10,000 in currency that he wanted to declare and asked him to open his bags. (Tr. 10). Roberts opened his luggage. Inspector Hanson found a shaving kit inside and opened it. The contents fit the agents' information; the shaving kit contained six Zip computer diskettes. (Tr. 11). Agent Hanson asked Roberts what the diskettes contained. Roberts gave no specific response. Agent Coffman then identified himself and took over the interview. (Tr. 34). Agent Coffman told Roberts he was with United States Customs and explained that they were "looking for currency" and "looking for the exportation of high technology or other data that was prohibited by law." (Tr. 34). Agent Coffman asked Roberts if he had anything that did not belong to him. Roberts "indicated it was all his property" (Tr. 34).

Agent Coffman told Roberts that the agents would have to search the diskettes to determine whether they could legally be taken out of the country. Agent Coffman told Roberts that he could either continue on his scheduled flight, leaving the diskettes with the agents to be searched and mailed back to him later, or that he could stay with the diskettes and fly to Paris on a later flight, at no additional charge. (Tr. 35–36). Roberts "indicated he wanted to wait." (Tr. 36).

Agents Coffman, Hanson, Rios, and Stewart escorted Roberts to a secondary inspection area. (Tr. 12). Agent Coffman opened Roberts' laptop computer. Agent Coffman told Roberts he "needed to scan the material on it" and asked if there was "anything [Roberts] could tell [him] about what was on the different diskettes, like a list of what's on it, any passwords or anything like that." (Tr. 39). Roberts said that he wished to cooperate, but wanted to talk to Agent Coffman privately. Agent Coffman escorted Roberts into an interview room.

In the interview room, Roberts told Agent Coffman that "he was embarrassed that there was some child pornography on the diskettes and he didn't want everybody to see it." (Tr. 39). Agent Coffman said, "What do you mean child pornography, like the teen stuff on the Internet …?" (Tr. 39). Roberts responded, "No, young kids," indicating that the images on the diskettes depicted six-year-old children. (Tr. 39).

Agent Coffman then left the interview room and told Agent Rios that Roberts had said that the diskettes contained child pornography. (Tr. 79). Agents Coffman and Rios decided to advise Roberts of his *Miranda* rights and to attempt to interview him about the diskettes. (Tr. 79). They presented Roberts with a waiver form setting out the *Miranda* rights. (Tr. 40). Roberts placed his initials after the statement of each right and signed the waiver portion of the form. (G.Ex. 11; Tr. 40). An entry on the form shows Roberts signed it at 4:58 p.m. (G.Ex. 11; Tr. 46). After Roberts signed the waiver form, Agent Coffman told him it was illegal "to have child pornography and take it out of the country." (Tr. 41). Agent Coffman asked Roberts where he had obtained the pornography; Roberts responded that he had downloaded it from "various Internet

---

3. Roberts was not the only person searched in the jetway. (Tr. 8). Inspector Hanson testified that Customs agents "are trained to look for certain characteristics or behaviorisms in individuals that would lead us to believe they should be inspected." (*Id.*). Sometimes, agents "will even choose people [to be searched] at random." (*Id.*).

sites, chat rooms, that sort of thing." (Tr. 41). Roberts said that he did not pay for the pornography and that it was for his personal use, not for resale. (Tr. 42).

Sometime after 5:00 p.m., Agent Coffman presented Roberts with a Consent to Search form, which he signed. (G.Ex. 12; Tr. 43, 46). The form authorized a complete search of Roberts' luggage, computer, and diskettes. (Tr. 43). The form also provided: "[Customs] Agents are authorized by me to take any letters, papers, materials, or other property which they may desire to examine." (G.Ex.12). The agents signed a "Custody Receipt for Retained or Seized Property," containing a list of the articles seized from Roberts. (G.Ex.13). Roberts signed the portion of the form headed "Notice of Abandonment and Assent to Forfeiture," which stated that he "hereby abandon[ed] all claim to the above described articles." (Id.).

Following routine Customs procedure, Agent Coffman presented Roberts with a blank form and told him he could record a written statement on the form if he wished to do so. (Tr. 44, 80). The agents left Roberts alone to decide whether to provide a statement. (Tr. 44). Roberts provided a four-page handwritten statement. (G.Ex.14, Tr. 43).

Agent Coffman then let Agent Rios and a coworker finish the interview. (Tr. 45). Agent Coffman testified that the agents seized the disks and took an inventory of them. After the interview ended, Roberts left without "his diskettes and stuff." (Tr. 47). Agent Coffman testified that he believed that another agent turned on Roberts' laptop computer that same day and confirmed that there were "pornographic-type photographs" on it. (Tr. 46).

The diskettes were not searched that day. (Tr. 45). Agent Rios testified that the computer and diskettes were sent to a computer forensics agent. (Tr. 101–02). The forensic examination of the diskettes began in September 1998. (Tr. 107). The forensic examination produced over 5,000 graphic images, "the majority of which depicted teen or pre-teen children engaged in sexually explicit conduct." (Docket Entry No. 1, Attachment A).

The agents executed an arrest warrant at IAH in the afternoon on June 20, 1999. (Tr. 19, 84–85). Agent Rios advised Roberts of his *Miranda* rights, and Roberts signed a Waiver of Rights form. (G.Ex. 15; Tr. 84–85). Roberts told Agents Rios that he knew the diskettes seized from him on August 25, 1998 contained child pornography. (Tr. 86). Roberts stated that he had obtained the child pornography on the Internet, where it was readily available. Roberts denied taking pictures of children himself and denied ever molesting children. (Tr. 87).

Roberts moves to suppress the evidence seized during the August 25, 1998 search, arguing that the search violated his Fourth Amendments rights. (Docket Entry No. 15). He has also moved to suppress the statements he made on that date as "the fruit of the poisonous tree." (Id.).

## II. The Legal Status of Border Searches

 Customs officials conducted the search of the defendant's luggage and computer diskettes without a warrant. "[W]arrantless searches and seizures are unreasonable per se unless they fall within a few narrowly defined exceptions." *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir.1998) (quoting *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir.1993)) (alteration in original). The border search doctrine is one of the exceptions to the warrant requirement. *See Rivas*, 157 F.3d at 367. Under the border search doctrine, government officials may conduct a "routine" search—a search that does not "seriously invade a traveler's privacy"—at an international border or its functional equivalent without a warrant, probable cause, or even a particularized suspicion of wrongdoing. *See id.* A more invasive "nonroutine" stop and search is constitutional if based on a reasonable suspicion of wrongdoing. *See id.*

The threshold issue presented by the motion to suppress is whether the border

search exception applies under the circumstances of this case. The defendant concedes that the jetway search occurred at the functional equivalent of an international border. He argues, however, that the border search exception does not apply when law enforcement officers attempt to use their border search authority to evade the warrant and probable cause requirements otherwise imposed by the Fourth Amendment.

The Customs agents decided to set up an outbound inspection in the jetway to Air France Flight 33 because they had received information that Roberts possessed child pornography and would leave the country on that flight. Defendant argues that law enforcement officials should not be permitted to conduct a warrantless search unrelated to the special law enforcement needs that provide the doctrinal justification for the border search exception. The government argues that the Customs agents' motives for the search are irrelevant to the Fourth Amendment analysis, provided they did not select individuals to be searched on the basis of a criterion prohibited from consideration by the equal protection principles embodied in the Due Process Clause of the Fifth Amendment.

The border search exception has been most frequently applied to searches of people and effects entering the United States. Its application in the export search context has been more recent and more limited. In *United States v. Berisha,* 925 F.2d 791 (5th Cir.1991), the Fifth Circuit held that Customs officials did not violate the Fourth Amendment by searching—without a warrant, probable cause, or even particularized suspicion—air passengers leaving the country. In that case, the search had the specific purpose to monitor compliance with federal currency reporting laws. In *Berisha,* a Customs inspector asked the defendant, who was preparing to board an international flight, whether he was carrying more than $10,000. The defendant said he had only $8,000. The inspector, noticing a bulge in the defendant's pants, escorted him to a secondary search area.

The defendant tried to hand a roll of currency to a traveling companion. The inspector interceded, finding that the defendant was carrying more than $17,000 in United States currency. The Fifth Circuit affirmed the district court's denial of the defendant's motion to suppress, holding that the border search exception, although originally developed in the context of searches of persons and effects entering the country, applied as well to export searches for currency. The court reasoned as follows:

> We note that both incoming and outgoing border searches have several features in common; for example, the government is interested in protecting some interest of United States citizens, there is a likelihood of smuggling attempts at the border, and the individual is on notice that his privacy may be invaded when he crosses the border. We also note that the underlying purpose for the foreign transaction reporting requirements was to regulate the export of monetary instruments in order to prevent the use of international currency transactions to evade domestic criminal, tax, and regulatory laws.
>
> Given the substantial national interest in regulating the exportation of domestic currency at the border and the similar features of incoming and outgoing border-crossing searches for fourth amendment purposes, we hold that in the context of a routine stop and search for currency, the rationale applied to border searches under the fourth amendment encompasses persons exiting as well as persons entering our borders. We find, therefore, that the detention and inquiry in this case was permissible under the fourth amendment.

*Id.* at 795. The court emphasized the narrowness of its holding, stating: "We express no opinion, however, on the fourth amendment implications of routine, suspicionless searches for exportation of articles other than monetary instruments." *Id.* at 795 n. 8. No case after *Berisha* has tested

the limits of the border search doctrine in the export search context. This case requires an answer to the question left open in *Berisha*, the scope of the border search doctrine applied to searches for exportation of articles other than currency.

Other circuits provide little guidance on this issue. Every circuit court that has addressed the issue has held that the border search exception applies to export searches. However, many of the cases involve export searches for currency. *See United States v. Ezeiruaku*, 936 F.2d 136, 140–43 (3d Cir.1991); *United States v. Hernandez–Salazar*, 813 F.2d 1126, 1136–39 (11th Cir.1987); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982); *cf. United States v. Oriakhi*, 57 F.3d 1290, 1296–97 (4th Cir.1995) (applying border search exception to search for currency reporting violation that resulted in the seizure of both firearms and currency); *but see United States v. Udofot*, 711 F.2d 831, 839–40 (8th Cir.1983) (holding that border search exception applied to export search resulting in seizure of firearm); *United States v. Ajlouny*, 629 F.2d 830, 833–35 (2d Cir.1980) (holding that border search exception applied to export search resulting in seizure of stolen telecommunications equipment). Several of these courts have, like the Fifth Circuit in *Berisha*, emphasized the narrowness of their holdings. No case has explicitly held that the border search exception applies identically to searches of persons or property entering and exiting the country, and without regard to the purpose of the search.

## A. The Pretext Argument

■ Roberts argues that Customs officials may not use the border search exception as a pretext to conduct a warrantless export search seeking evidence of criminal activity unrelated to any export control law. The record supports Roberts' argument that Customs officials decided to set up an outbound inspection in the jetway to Air France Flight 33 in order to search the defendant, based on information that he was leaving the country with computer diskettes containing child pornography.

Defendant claims that Customs officials improperly attempted to use the border search exception to circumvent the usual warrant and probable cause requirements of the Fourth Amendment. The government argues that the border search exception applies regardless of Customs officials' motives for conducting the export search.

The Supreme Court has consistently rejected the argument that Fourth Amendment analysis requires an examination of a law enforcement officer's subjective motives in conducting a search, focusing instead on whether objective circumstances justified the search. In *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Court held that "the temporary detention of a motorist who the police ha[d] probable cause to believe ha[d] committed a civil traffic violation" was valid under the Fourth Amendment, even if the officers involved were not "motivated to stop the car by a desire to enforce the traffic laws." *Id.* at 808, 116 S.Ct. 1769. In *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Court held that a search incident to a lawful traffic violation arrest would not be "rendered invalid by the fact that it was 'a mere pretext for a narcotics search'" for which officers had no warrant or probable cause. *Whren*, 517 U.S. at 813, 116 S.Ct. 1769 (quoting *Robinson*, 414 U.S. at 221, n. 1, 94 S.Ct. 467). Similarly, in *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), the Court held that a search incident to an arrest did not violate the Fourth Amendment merely because the searching officer "was not motivated by the officer-safety concern that justifies such searches." *Whren*, 517 U.S. at 813, 116 S.Ct. 1769 (construing *Gustafson*, 414 U.S. at 266). As the Court stated in *Gustafson:* "[s]ince it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the searching officer] did not indicate any subjective fear of the petitioner or that he did not himself suspect that the petitioner was

armed." *Gustafson,* 414 U.S. at 266, 94 S.Ct. 488.

In *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), the Court rejected the contention that wiretap evidence should be excluded because the agents conducting the tap did not make a good faith effort to comply with the statutory requirement to minimize the interception of unauthorized communications. The Court stated: "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify the action." *Scott,* 436 U.S. at 138, 98 S.Ct. 1717. The Court agreed with the government's position that "the existence *vel non* of [a Fourth Amendment violation] turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Id.* at 136, 98 S.Ct. 1717.

In *United States v. Villamonte–Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), the Court "held that an otherwise valid warrantless boarding of a vessel by Customs officials was not rendered invalid 'because the [C]ustoms officers were accompanied by a Louisiana state policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marihuana.'" *Whren,* 517 U.S. at 812, 116 S.Ct. 1769 (quoting *Villamonte–Marquez,* 462 U.S. at 584, n. 3, 103 S.Ct. 2573). The Customs officials had boarded the vessel under 19 U.S.C. § 1581(a), which authorized Customs officers "at any time ... [to] go on board of any vessel ... at any place in the United States or within the Customs waters" for inspection of the vessel's registration documents. The Court held that the statute and the Customs officials' actions under it were reasonable for the purpose of the Fourth Amendment and "flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification." *Whren,* 517 U.S. at 812, 116 S.Ct. 1769 (construing

*Villamonte–Marquez,* 462 U.S. at 584, n. 3, 103 S.Ct. 2573).

There are two narrow contexts in which the Court has disapproved "police attempts to use valid bases of action against citizens as pretexts for pursuing other investigatory agendas." *Whren,* 517 U.S. at 811, 116 S.Ct. 1769. The first is the inventory search doctrine, which permits law enforcement officers to search seized property, without a warrant or probable cause, in order to take an inventory of the property, provided the inventory search is conducted pursuant to reasonable, standardized police procedures. *See Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Adherence to standardized police procedures ensures that an inventory search is not merely "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). In a case approving an inventory search, the Court noted that "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation." *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

The "special needs" administrative inspection is the second context in which the Supreme Court limits pretextual searches. Under the administrative search doctrine, officials may search commercial premises to monitor regulatory compliance in a "closely regulated" industry, without a warrant or probable cause. However, such warrantless inspections are constitutional only if three criteria are met: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made," *New York v. Burger,* 482 U.S. 691, 702, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (citing *Donovan v. Dewey,* 452 U.S. 594, 602, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981)); (2) "the warrant-

less inspections must be 'necessary to further [the] regulatory scheme,'" *Burger,* 482 U.S. at 702, 107 S.Ct. 2636 (quoting *Donovan,* 452 U.S. at 600, 101 S.Ct. 2534) (alterations in original); and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant," *Burger,* 482 U.S. at 702, 107 S.Ct. 2636 (quoting *Donovan,* 452 U.S. at 603, 101 S.Ct. 2534). In *Burger,* the Court upheld an inspection of a vehicle-dismantling business under a state's administrative regulations in part because there was "no reason to believe that the ... inspection was actually a 'pretext' for obtaining evidence of [a] violation of the penal laws." *Id.* at 716, n. 27, 107 S.Ct. 2636.

To ensure that the latitude afforded government officials under the inventory search and administrative inspection exceptions is not used systematically to evade constitutional limits on searches conducted to gather evidence of criminal wrongdoing, the Supreme Court has built into both doctrines limits on the discretion of law enforcement officers. The Court's "decisions have always adhered to the requirement that [inventory searches] be conducted according to standardized criteria." *Bertine,* 479 U.S. at 374 n. 6, 107 S.Ct. 738 (citing *Lafayette,* 462 U.S. at 648, 103 S.Ct. 2605; *Opperman,* 428 U.S. at 374–75, 96 S.Ct. 3092). Under the administrative search exception, the Court requires that the regulatory scheme include an inspection program that informs the business operator that he will be regularly searched and limits the time, place, and scope of the inspections "to place appropriate restraints on the discretion of the inspecting officers." *Burger,* 482 U.S. at 711; *see also Donovan,* 452 U.S. at 603–05, 101 S.Ct. 2534; *United States v. Biswell,* 406 U.S. 311, 315, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

In contrast to an inventory search and an administrative inspection, a border search is more directly related to the discovery of criminal wrongdoing. The courts do not require that border searches be conducted according to a standardized policy or that strict limits be placed on the discretion of the officers conducting the search. A border search more closely resembles the law enforcement activity addressed in *Whren, Robertson, Gustafson, Scott,* and *Villamonte-Marquez,* in which the Court held that the searching officer's state of mind is not relevant as long as objective circumstances justify the search, than it does the inventory search or administrative inspection, in which the Court has suggested that the searching officer's motives are relevant. As the Court stated in *Whren,* it has "never held, outside the context of inventory search or administrative inspection ..., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment." *Whren,* 517 U.S. at 812, 116 S.Ct. 1769. This court does not reach such a holding in this case.

Even assuming that the searching officers in this case were motivated by the desire to uncover violations of laws other than currency reporting and export control laws, this fact does not make the export search, if otherwise valid, unconstitutional.

### B. The Scope of the Border Search Exception

Courts have not expressly determined whether the border search doctrine applies in the same way to export searches as it does to searches of persons and effects entering the country. If it does, and if the scope of a routine search is the same in both contexts, then routine export searches may be conducted with no particularized suspicion, and nonroutine export searches may be conducted if agents have a "reasonable suspicion of wrongdoing."

However, the government's interests differ across the two contexts. The government has a strong interest in preventing contraband from entering the country; it does not necessarily have an identical interest in preventing all types of contraband from leaving the country. It is not surprising that courts have usually upheld the routine search of persons crossing the

border to leave the country in cases involving suspected violations of currency reporting laws. Those courts stress the government's interest in monitoring the outflow of currency. Courts have not addressed whether the constitutionality of border searches of persons leaving the country should depend not only on the extent and routine nature of the intrusion on the traveler's privacy, but also on whether the search is reasonably related to the discovery of a violation of an export control law. Courts have also not addressed whether a nonroutine search must be justified by a reasonable suspicion of an export control violation, not merely by a reasonable suspicion of criminal wrongdoing.

With this background of the law on the scope of the border search exception in mind, this court reviews the actions of the Customs agents on August 25, 1998.

### III. Analysis

■ The actions of Customs agents in detaining Roberts to question him and to search his luggage at the primary search table clearly fell within a "routine" border search. By searching Roberts' luggage at the functional equivalent of the border and asking whether Roberts was carrying over $10,000 in currency or technology that could not legally be exported, the agents' actions were routine and reasonably related to laws regulating exports. In escorting Roberts to the secondary search area, the agents remained within the scope of a routine and constitutional border search.

In the secondary search area, Agent Coffman told Roberts that agents needed to search his computer and diskettes to determine whether they contained technology or other data that could not legally be exported. Roberts then admitted that the diskettes contained child pornography. Roberts signed a waiver of his *Miranda* rights and signed a Consent to Search form authorizing a complete search of his luggage, including his computer and the diskettes.

The government argues that the subsequent searches of Roberts' computer and diskettes could not have violated the Fourth Amendment because Roberts consented to those searches. Roberts argues that the government induced his consent by first telling him that they would proceed to search his computer and diskettes even without consent. Roberts argues that they could not lawfully have conducted such a search and therefore that his consent was not voluntarily given.

After he waived his *Miranda* rights, Roberts signed a Consent to Search form, agreeing to allow Customs agents "to conduct a complete search of [his] luggage, computer, [and] diskettes." (G.Ex.12). The Consent to Search authorized Customs agents "to take any letters, papers, materials, or other property which they may desire to examine." (*Id.*). The agents filled out and signed a "Custody Receipt for Retained or Seized Property." (G.Ex.13). Roberts signed the portion of that form headed "Notice of Abandonment and Assent to Forfeiture," stating that he "hereby abandon[ed] all claim to the above described articles." (*Id.*).

■ Generally, "consent operates as a waiver of Fourth Amendment rights if, by a preponderance of the evidence, it is found to have been given voluntarily under the totality of the circumstances." *United States v. Webster*, 162 F.3d 308, 333 (5th Cir.1998); *see also United States v. Cooper*, 43 F.3d 140, 144 (5th Cir.1995); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Roberts argues that the Customs agents' statements that they intended to search his computer and Zip diskettes even absent his consent vitiated his consent to that search. The facts of this case are similar to cases in which officers tell an individual that they will obtain a search warrant if that individual does not consent to the search. In such circumstances, the courts hold that well-founded threats to obtain a warrant do not vitiate consent, but that empty threats might. *See United*

*States v. Duran,* 957 F.2d 499, 502 (7th Cir.1992); *see also United States v. Loving,* 41 M.J. 213, 244–45 (U.S.C.A.A.F. 1994); *United States v. Twomey,* 884 F.2d 46, 51–52 (1st Cir.1989); *United States v. Tolley,* 173 F.3d 431, 1999 WL 137620, *8 (6th Cir.1999) (unpublished disposition). If an officer says that he will obtain a search warrant if consent to search is not given, but probable cause to support a warrant application is lacking, then a consent to that search may be invalid.

The courts have not clearly stated whether it is critical that the searching officer had a reasonable, good-faith belief that a warrant would properly issue, or that the warrant could in fact have issued consistent with the Fourth Amendment. *See Twomey,* 884 F.2d at 52. However, that distinction does not make a difference in this case. The Customs agents clearly could have searched Roberts' computer and Zip diskettes on August 25, 1998, even if Roberts had not consented. The agents' statements that they intended to conduct the search was a "well-founded threat" that did not vitiate Roberts' consent.

■ The search of the defendant's computer and diskettes would have been a routine export search, valid under the Fourth Amendment.[4] " 'Routine searches' are generally classified as those which do not 'seriously invade a traveler's privacy.' " *United States v. Rivas,* 157 F.3d at 367 (quoting *Cardenas,* 9 F.3d at 1148 n. 3). The First Circuit has set forth the following factors for determining the degree of invasiveness involved in a search: (1) whether the search results in the exposure of intimate body parts or requires the suspect to disrobe; (2) whether physical contact between Customs officials and the suspect occurs during the search; (3) whether force is used to effect the search; (4) whether the type of search exposes the suspect to pain or danger; (5) the overall manner in which the search is conducted; and (6) whether the suspect's reasonable expectations of privacy, if any, are abrogated by the search. *United States v. Braks,* 842 F.2d 509, 512 (1st Cir.1988). Courts consistently treat two categories of search as nonroutine: strip-searches and body-cavity searches. *See Braks,* 842 F.2d at 512–13. The Fifth Circuit has held that Customs agents who drilled into the body of an automobile at a border checkpoint conducted a nonroutine search. *See Rivas,* 157 F.3d at 367; *see also United States v. Robles,* 45 F.3d 1, 5 (1st Cir.1995) (holding that drilling into a metal cylinder during an airport search was nonroutine because it involved the use of force and destroyed property).

A search of Roberts' computer and diskettes would not have been destructive or so personally invasive as to be nonroutine. Several courts have analogized the Fourth Amendment protection appropriately afforded an individual's computer files and computer hard drive to the protection given an individual's closed containers and closed personal effects. *United States v. Barth,* 26 F.Supp.2d 929, 936–37 (W.D.Tex.1998); *United States v. David,* 756 F.Supp. 1385, 1390 (holding that a computer notebook "is indistinguishable from any other closed container" for the purpose of Fourth Amendment analysis); *cf. also United States v. O'Razvi,* 1998 WL 405048, *6 (S.D.N.Y.1998) (suggesting that personal computers might be analogized to closed containers in their degree of Fourth Amendment protection); *United States v.*

---

4. If the border search exception applies to export searches in the same way it applies to searches of persons and property entering the country, then the agents had the authority to search the defendant's computer and diskettes even if that search would be "nonroutine." The agents needed only a "reasonable suspicion of wrongdoing" to conduct a nonroutine search. They had a reasonable suspicion based on the information they had previously received about the defendant and their corroboration of that information in their preliminary observations and during the routine detention and search in the jetway. *See United States v. Gonzalez,* 190 F.3d 668, 672 (5th Cir.1999); *United States v. Lopez–Gonzalez,* 916 F.2d 1011, 1013–14 (5th Cir.1990); *see also Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

*Blas,* 1990 WL 265179, *21 (E.D.Wis.1990) (holding that "an individual has the same expectation of privacy in a pager, computer, or other electronic storage device as in a closed container").

The opening of luggage, itself a closed container, is the paradigmatic routine border search. *See United States v. Cardenas,* 9 F.3d 1139, 1148 n. 3 (5th Cir.1993) (collecting cases); *United States v. Ezeiruaku,* 936 F.2d 136, 140–41 (3d Cir.1995) (same). There is no reason to conclude that a nondestructive search of Roberts' computer and diskettes, also closed containers, would have been nonroutine. Under a more restrictive approach to the export search doctrine that would require a reasonable relationship between the search and the export control laws, the search of Roberts' computer and diskettes would be still permissible because it would have been reasonably related to enforcing laws prohibiting the export of certain technological or other data. The Customs agents' statements that they intended to search Roberts' computer and diskettes were not threats to conduct a search that they could not lawfully have made without consent. Roberts' consent to search is not vitiated on this ground.

■■■ Nor is Roberts' consent to search invalid on other grounds. In evaluating the voluntariness of consent, a court considers six factors: (1) the defendant's custodial status; (2) the presence of coercive law enforcement procedures; (3) the extent and level of the defendant's cooperation with law enforcement; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Cooper,* 43 F.3d at 144; *see also Webster,* 162 F.3d at 333. No single factor is dispositive in this analysis. *See Cooper,* 43 F.3d at 144; *United States v. Gonzales,* 842 F.2d 748, 754–55 (5th Cir.1988). The government bears the burden of proving, by a preponderance of the evidence, that the consent to search was voluntary. *See Cooper,* 43 F.3d at 144.

■■■ Before escorting Roberts to the secondary search area, Customs agents told Roberts that he either could continue his travel and leave his diskettes behind to be searched, or could miss his plane and wait until his diskettes were searched. After Roberts admitted that the diskettes contained child pornography and before he signed the consent to search form, Agents Coffman and Rios read Roberts his *Miranda* rights. The record does not disclose any coercive police tactics. Roberts generally cooperated with the investigation. Roberts knew of his right to refuse to consent. The consent to search form that he signed included the statement, "I have been informed by [Agent Coffman] of my right to refuse to consent to a search of my property." (G.Ex.12). The record discloses that Roberts worked for an oil company in a professional capacity. Nothing suggests that any lack of education or intelligence made his consent involuntary. Roberts' admission makes it clear that he knew that incriminating evidence would be found if agents searched the diskettes. Based on the totality of the circumstances, this court finds that Roberts voluntarily gave his consent. The later searches of Roberts' computer, diskettes, or other effects were constitutional in light of this consent.

Roberts also moves to suppress the statements he made during the course of the border search. Because this court finds no Fourth Amendment violations, there is no basis to suppress the statements as "the fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The record discloses no coercive conduct by Customs agents that would render Roberts' statements involuntary under the Fifth Amendment privilege against self-incrimination. *See Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Neither are Roberts' statements subject to suppression under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Roberts waived his *Miranda* rights during his August 25, 1998

detention. His statements before the waiver were made in connection with a routine export border search. The Fifth Circuit has held that "*Miranda* warnings are unnecessary during routine questioning and searches by Customs agents." *Berisha*, 925 F.2d at 797. Roberts statements are admissible at trial.

## III. CONCLUSION

There is no basis for the suppression of the evidence seized as a result of the August 25, 1998 search of Roberts or for suppression of the statements Roberts made on that date. Roberts' motion to suppress is DENIED.